**The CAPABILITY GROUP, INC., Plaintiff,**

**v.**

**AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., Defendant.**

**Civil Action No. 08–cv–10136–DPW.**

United States District Court, D. Massachusetts.

Feb. 12, 2010.

Brett N. Dorny, Law Office of Brett N. Dorny, Northboro, MA, for Plaintiff.

Louis Smith, John F. Farraher, Jr., Zachary C. Kleinsasser, Greenberg Traurig LLP, Florham Park, NJ, for Defendant.

## MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, District Judge.

American Express Travel Related Services Company, Inc. ("AMEX") contracted with The Capability Group ("TCG") to train AMEX employees and develop course materials in Six Sigma, a methodology designed to improve corporate efficiency. On January 29, 2008, TCG sued AMEX, seeking damages and an injunction, based on breach of contract for failure to pay full compensation and breach of the contract's license and confidentiality provisions, and also asserting a claim styled "Accounting for Copyright License." On August 28, 2009, following completion of discovery, AMEX brought the motion now before me for summary judgment on all counts of the complaint.

## I. FACTUAL BACKGROUND

In accordance with the summary judgment standard, I view the record in the light most favorable to TCG, as the nonmoving party. *See Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.").

### A. Six Sigma Training at AMEX

AMEX, a New York corporation, is a leading global payments and travel company. TCG, a Nevada corporation with a principal place of business in Boston, Massachusetts, trains companies in the principles of Six Sigma, a process improvement methodology that increases business effectiveness.

In 1998, TCG, as an independent contractor for a company called Six Sigma Academy, trained AMEX employees and certain outside contractors and consultants in the Six Sigma methodology. The Six Sigma training was implemented and monitored across all of AMEX's business units and divisions by AMEX's Global Six Sigma Performance Group ("Performance Group"). Six Sigma Academy provided services to AMEX through late 2000 and assisted with the implementation of hundreds of Six Sigma projects. As of late 2000, the Performance Group had approximately 25–30 employees and its Vice President was Janet Young.

AMEX tracked financial and other project information relating to Six Sigma projects on a computer system called "Quality Management System" ("QMS") that was later upgraded to a faster "R6" system (the "System"). The System was used to track two types of savings on a project-by-project basis: "projected" (or forecast) savings (i.e., the savings that a project might achieve upon completion) and "actual" savings (i.e., the savings that a project actually achieved). The projected savings changed over the course of the project, but the actual savings, once determined and approved by the project's finance person, did not change. Most Six Sigma projects continued to generate savings for several years after their completion; AMEX tracked such savings for two years beyond the project completion date.

### B. AMEX's Agreement with TCG

In 2000, AMEX approached TCG directly about providing Six Sigma course materials and training. At that time, TCG had severed its relationship with Six Sigma Academy. In August 2000, AMEX engaged TCG to replace Six Sigma Academy, to develop Six Sigma training materials, and to provide Six Sigma training for certain AMEX employees, consultants, and contractors. The parties entered into a contract titled the American Express Process Improvement Support Agreement (the "Agreement") on August 14, 2000; the Agreement was later amended on March 7, 2001.

Under the Agreement, TCG agreed to provide Six Sigma training and to develop a variety of course materials. (Agreement ¶ 2.) TCG estimates the value of the materials and training desired by AMEX to be $6 million. In exchange for these services, AMEX agreed to pay a co-development fee (including "Base Compensation" of $4 million), additional compensation for miscellaneous services by TCG, and a "gain sharing" fee, subject to certain conditions. (Id. at ¶ 8; Amendment, Ex. E.) TCG acknowledges that AMEX paid "all required compensation" except for the gain sharing fee.

With respect to the Six Sigma training materials, TCG was to provide AMEX with "Base Course Materials," defined as "a base course system text that includes all requisite concepts, statistical theory, tools and software guides to meet the collaborative objectives of TCG and AMEX . . . ." (Agreement ¶ 2(b).) The Agreement also discussed the development of "Custom Course Materials," which included any "modifications to the Base Course Materials that relate to AMEX or its business," "the elements added or customized by AMEX (or by TCG, in consultation with AMEX)," "modifications made by TCG in response to AMEX's comments," and "any AMEX-specific information identified by AMEX which was originally included by TCG in the Base Course Materials." (Id. at ¶ 2(c).) The Agreement also refers to "AMEX Process Improvement Course Materials," which were to be the result of integrating the Custom Course Materials into the Base Course Materials. (Id.) The term "Course Materials" in the Agreement refers, collectively, to Base Course Materials, Custom Course Materials, AMEX Pro-

cess Improvement Course Materials, and any other materials created under the terms of the Agreement.[1] (*Id.* at ¶ 2(i).)

In September 2001, TCG hired BGM Services, Inc. and its principal Arthur Zentner to help develop the Course Materials and to provide Six Sigma training. At that time, none of the Course Materials had been created; they were developed over the following 12 to 15 months. The Custom Course Materials were never developed. Kevin Weiss, President of TCG, testified that he did not recall "anything that [AMEX] created that ... was put into our materials," and therefore Weiss maintains that the AMEX Process Improvement Course Materials comprised solely of the Base Course Materials that TCG had provided to AMEX. AMEX, on the other hand, asserts that TCG never developed the AMEX Process Improvement Course Materials because nothing had been added beyond the Base Course Materials.

On December 31, 2001, TCG concluded its work under the Agreement.

### C. Gain Sharing Payment

The Agreement provided that, as additional compensation, AMEX would pay TCG a gain sharing fee "based on the calculated benefit of the net savings to AMEX ... realized during the calendar year 2001 resulting from the materials, training, coaching and development of personnel contemplated by this Agreement."[2] (Amendment ¶ 9(c).) The parties expressly agreed that the gain sharing would be "determined by AMEX using the system it uses itself to internally track and report on

such savings for internal business purposes," i.e. the System described above, and that "[t]he savings calculations from AMEX's system shall be determinative and not subject to challenge by TCG." (Agreement ¶ 8(c)(1).) AMEX agreed to "provide regular reports off of this system to TCG ...." (*Id.*)

As agreed by the parties, the gain sharing payment only would be made "if realized actual net savings during the calendar Year 2001 equals or exceeds $106 million." (Amendment, Ex. E.) If AMEX's "actual net savings shown on AMEX's tracking system described in Section 8.c.1 of this Agreement realized during the calendar year 2001 equals or exceeds $106 million," then AMEX would pay TCG "a gain sharing payment equal to $1 million plus 10% of the amount by which such actual net savings realized during the calendar year 2001 exceed $106 million; provided however, that in no event will the total gain sharing payment made under this Agreement exceed $3 million." (*Id.*) If the $106 million savings threshold was not met, then no gain sharing payment would be due. (*Id.*)

In August 2001, TCG claims, it was reported in a conference call that AMEX had achieved its $106 million savings target. On December 12, 2001, Janet Young of AMEX emailed TCG's President Weiss about the "[p]rinciples utilized to determine Gain Share Threshold," stating "[b]ased on the calculated benefit of the net savings to AMEX realised during calendar year 2001 Calculated Net financial

---

**1.** Although the initial Agreement also refers to "Publishable Custom Course Materials," the Amendment states that these materials would not be created and removed all references to them from the original Agreement. (Amendment ¶ 6.)

**2.** TCG objects to AMEX's characterization of the gain share as a "bonus payment," and

contends that this compensation structure—in which a portion of the compensation was paid based upon AMEX's recorded savings—was designed to address AMEX's "reluctance to pay" the Agreement's $6 million value upfront and the "expected savings." This dispute over characterization has no significance to the motion before me.

savings does not include projects completed prior to 08/00 with financial benefits in 2001," i.e., before TCG began training AMEX. Though Weiss disagreed with the principles set forth in Young's email, he found no need to object because Young had indicated that the "Current projected Net Savings as of November, 2001" was $102 million and Weiss believed the $106 million threshold would be exceeded by the end of December.

In late 2001, Young and a team of executives from the Performance Group commenced a "four-month deliberative process" to determine whether AMEX achieved $106 million in net savings as a result of TCG's services. The team ultimately concluded that the realized actual net savings in 2001, attributable to TCG's services under the Agreement, was $90,862,649, well below the requisite $106 million threshold to be eligible for a gain sharing payment. TCG disputes that the team properly determined the actual net savings realized in 2001 within the terms of the Agreement. Citing language in Exhibit E that the gain share was to be paid if "AMEX actual net savings shown on AMEX's tracking system . . . realized during the calendar year 2001 equals or exceeds $106 million," TCG contends that the savings are evident in AMEX's "internal tracking system," which AMEX identified as the QMS or R6 System.

On January 31, 2002, TCG's counsel David McAnaney wrote a letter to Young and Julie Schechter, AMEX's counsel, stating: "Pursuant to the provisions of paragraph 8.c.(1) of the Agreement, AMEX was required to 'provide regular reports' off of this system [internal tracking system]. To date, we have not received any reports." McAnaney requested "all such reports, including historical monthly or quarterly reports for the 2001 period."

On March 25, 2002, Young emailed Weiss and McAnaney regarding AMEX's calculation of the gain sharing payment and also responded to various confidentiality issues raised by McAnaney's January letter. Young stated that "no gain sharing payment is due" to TCG because "the threshold amount achieved is $90,862,649." The email included two attachments. First, a savings report showing that AMEX's savings in 2001, as recorded in the System, was $149,596,801. Second, an Excel file, titled "Final—TCG Contract Pay–Out Final gain share analysis," which included two worksheets, both titled "Analysis of 2001 Bonus Payment due to TCG." Both worksheets start with approximately $149 million, which is labeled "2001 Gross Financial Impact as of 12/31 (net of cost to implement)," and take deductions from that number to determine whether a gain sharing payment is due. One analysis worksheet, as noted in Young's email, showed a savings of $90,862,649 and no gain sharing payment due. The other worksheet, otherwise unidentified, showed a savings of $107,373,629 and a gain sharing payment of $1 million.

TCG's counsel McAnaney wrote to Young and Schechter on November 5, 2002, observing that "AMEX's reports are inconsistent," and he demanded a gain share payment of $3 million based on the gain share savings of $149,596,801. On March 20, 2003, Schechter responded: "Your characterization of our starting point of $149,596,801 as 'gain sharing savings' is incorrect. That figure represents the total savings reflected on the QMS tracking system for all the projects tracked on that system—including projects that are and projects that are not part of the gain sharing base."

### D. Confidentiality and License of the Course Materials

The parties' dispute also concerns the confidentiality of the Course Materials.

The Agreement provided that "[k]ey employees of each party working on developing the Course Materials will be required to sign Confidentiality Agreements ... upon request as a condition to their working on the project." (Agreement ¶ 4(f) & Ex. F.) The Agreement is express that a "breach involving confidential information," as proscribed in Section 4, entitles the injured party to request an injunction, as well as costs and expenses incurred in obtaining that injunction, including attorneys' fees. (*Id.* at ¶ 9(g).)

With regard to ownership of these materials, the Agreement provided that TCG retained ownership of the Base Course Materials, AMEX owned the Custom Course Materials, and the parties jointly owned the AMEX Process Improvement Course Materials. (*Id.* at ¶ 5(a).) The Agreement also granted AMEX a license "to use, make ongoing changes to, and distribute the Course Materials and to provide associated training internally to its employees, affiliates, and employees of its affiliates." (*Id.* at ¶ 5(b).) The license further authorized AMEX "to use, make ongoing changes to, and distribute the Course Materials and to provide associated training to contractors and consultants who AMEX determines are integral to AMEX business initiatives where the quality tools and process improvement philosophy are being deployed;" this license was conditional, however, "provided that the employers of any such contractors and consultants, and the contractors and consultants themselves, sign Confidentiality Agreements ... prior to receiving the Course Materials or participating in the training." (*Id.*) Finally, the license permitted AMEX "to provide the Custom Course Materials and the AMEX Process Improvement Course Materials to internal or outside training companies who have signed Confidentiality Agreements ... as necessary for their use in conducting or in assisting AMEX in conducting training

...." (*Id.*) The license terms applied to AMEX both during and after the term of the Agreement. (*Id.*)

It is undisputed that AMEX trained certain non-employees, e.g. consultants and contractors, in Six Sigma. AMEX claims there is "no evidence" that this training occurred after 2003, or that AMEX received payments from any of the consultants or contractors who were trained with the Course Materials. TCG, however, contends that AMEX trained various non-employees without complying with the terms of the license, for example, by failing to determine whether they were "integral" to AMEX business initiatives and without obtaining signed Confidentiality Agreements prior to providing the training. AMEX responds that there is no evidence that any AMEX contractor or consultant who received Six Sigma training utilized the training for purposes other than their work with AMEX.

With regard to the Course Materials, AMEX claims it "completely stopped using TCG Course Materials" by 2005. Richard Irving, AMEX's Rule 30(b)(6) designee regarding confidentiality of course materials, testified that AMEX created new Six Sigma materials "from scratch" and "took the master files that we had from TCG and sent them to our legal department so that we did not have access to them." TCG, however, interprets this statement to mean that AMEX still retained the materials, and consequently, that those AMEX employees who created the "new materials" previously had access to and were trained using the TCG Course Materials.

TCG further argues that AMEX kept no records of who had been trained using the Course Materials or to whom those materials were distributed and that AMEX had no procedure to ensure that its former employees did not retain TCG Course Materials after they left AMEX. Irving testi-

fied that AMEX does not keep track of the number of copies made. He also acknowledged that the checklist used during exit interviews requires the former employee to return "materials, manuals, and other documents," but does not specifically identify TCG Course Materials. Therefore, TCG argues that AMEX "has no information about who was trained, it cannot know what compensation, if any, was received, or what savings [AMEX] may have obtained from the projects on which unlicensed consultants and contractors were involved."

In his January 31, 2002 letter, TCG's counsel McAnaney suggested to AMEX's counsel Schechter that AMEX had not been diligent in protecting the confidentiality of the Course Materials. McAnaney wrote that TCG was "advised that AMEX contracted with a third-party vendor to incorporate the TCG confidential information into a computer-training program" and that vendor, The Quality Group ("Quality"), also "used such confidential material in an on-line demo." He requested copies of "all third-party contractor confidentiality agreements signed to date." In an email dated March 25, 2002, Young wrote McAnaney and Weiss that AMEX "understands its ongoing obligations with respect to confidentiality" and noted that AMEX "will continue to be vigilant in completing the Confidentiality Agreement forms" as required by the Agreement. Admitting that Quality had used the confidential material in the on-line demo, Young acknowledged this "use was not authorized by American Express" and that "once American Express was made aware of the situation, we immediately took action" and "[t]he vendor immediately complied with our request to take down the demo and to cease the unauthorized use." However, TCG claims that Quality continued to use TCG's confidential material. Over a year later, on April 25, 2003, Quality's president informed AMEX that TCG

had brought a copyright infringement claim against Quality for use of TCG's confidential materials. On June 20, 2003, Schechter responded that AMEX was "surprised to hear" that Quality had used TCG material obtained from AMEX.

In the above-referenced November 5, 2002 letter to Young and Schechter, McAnaney suggested that former AMEX employees impermissibly had taken and used Course Materials that contained TCG's confidential information in their new employment. He requested "a list of *all* outside suppliers and vendors trained by American Express, together with copies of the Confidentiality Agreements executed pursuant to the requirements of the Agreement."

On March 20, 2003, Schechter responded that AMEX "has fully complied with the confidentiality provisions of the Agreement." She acknowledged that one former AMEX employee "did have a copy of the [TCG Course Materials] in an unopened box, which he stated he had never reviewed or used since leaving the company, and which he has since returned to us." She also provided a list and copies of Confidentiality Agreements executed by its trained contractors. However, TCG points out that some of those Confidentiality Agreements were from individuals whose employers had not executed Confidentiality Agreements. Specifically, TCG claims that AMEX trained certain non-employees from Travel Impressions, Inc. without obtaining signed Confidentiality Agreements from the company. Documents produced during discovery also suggested that certain Confidentiality Agreements were not signed *before* but "long after the training had occurred," and therefore "the dates on the Confidentiality Agreements cannot be relied upon to show when they were actually executed."

Additionally, TCG points to a contractor from IBM who was trained and provided Course Materials even though she "refused to sign the confidentiality agreement." In his January 31, 2002 letter, McAnaney requested information about this IBM employee; Young replied in her March 25, 2002 email that AMEX had "escalated this issue to the Vice President of that area to ensure the contractor in question completes the required form of Confidentiality Agreement." In a subsequent letter, dated March 20, 2003, Young stated "[w]ith respect to the one IBM employee trained early on, we did collect and destroy the materials she received." However, AMEX did not collect these materials until January 2003, two years after that IBM employee started training and after TCG's counsel sent AMEX two letters regarding this potential confidentiality breach.

AMEX counters that, despite the confidentiality provision, TCG shared AMEX's confidential materials with Zentner, a non-employee who did not sign a confidentiality agreement. AMEX claims Zentner had these materials in his possession from late 2000 through 2009. Zentner testified that, after the Agreement was terminated in 2002, he informed Weiss that he still had AMEX's confidential information in his possession, and that Weiss told him "[j]ust hang onto it."

TCG responds that AMEX was aware of Zentner's involvement in providing Six Sigma training and course materials and never requested that he execute a Confidentiality Agreement. Moreover, as Zentner testified, his company BGM had a written agreement with TCG that addressed the issue of confidentiality, and Zentner understood his confidentiality obligation to extend to AMEX's confidential information. Finally, TCG argues that the Agreement does not require the parties to return confidential information upon the termination of the Agreement.

## II. STANDARD FOR SUMMARY JUDGMENT

■ "Summary judgment is appropriate when the record shows that 'there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Fiacco v. Sigma Alpha Epsilon Fraternity*, 528 F.3d 94, 98 (1st Cir.2008) (quoting FED. R. CIV. P. 56(c)). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.2004). When evaluating a summary judgment motion, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nonetheless, the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256, 106 S.Ct. 2505. Ultimately, "[t]he judicial function in conducting this evaluation is not to weigh the evidence and determine the truth of the matter, but rather to determine whether the evidence presented is such that a jury 'could reasonably find for either the plaintiff or the defendant.'" *Nna v. Am. Standard, Inc.*, 630 F.Supp.2d 115, 124 (D.Mass.2009) (quoting *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. 2505).

## III. DISCUSSION

New York law applies to this case because, pursuant to Section 13(f), the Agreement is expressly "governed by the laws of the State of New York," and there is no apparent reason to depart from the parties' agreement. *See generally Ne. Data Sys. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 610 (1st Cir. 1993).

### A. Breach of Contract for Failure to Pay Gain Sharing Payment

TCG alleges that AMEX breached Section 8 of the Agreement by failing to pay TCG the gain sharing payment. To determine whether TCG was entitled to the gain sharing payment, AMEX's Performance Group undertook a "four-month deliberative process" to calculate AMEX's net savings actually realized in 2001 that were attributable to TCG's services. Young testified that the following principles guided the team's analysis: (1) "only 'net savings' that were 'realized' in 2001 were included in the calculation," (2) "only savings from projects that were supported by TCG under the terms of the Agreement were included in the calculation," and (3) "[s]avings resulting from projects that were not supported by TCG were not included."

The results of the Performance Group's analysis are reflected in a chart titled "Analysis of 2001 Bonus Payment due to TCG." This chart starts with the value $149,596,801, which is the "2001 Gross Financial Impact as of 12/31." From that number, the "Program costs" ($8.1 million) were deducted to reach the "Total 2001 *Net* Financial Impact: projection" of $141,496,801. Next, there were deductions for "Re-engineering Team Project" and "Projects completed in or prior to 10/00 (with financial benefit in 2001)." The end result was $90,862,649—below the $106 million threshold to be eligible for a gain sharing payment. TCG contends that this calculation does not accord with the terms of the Agreement.

In support of their respective positions, the parties submit different interpretations of Section 8 and amended Exhibit E relating to the gain share payment. Under New York law, "summary judgment when interpreting a contract may be granted only when 'the intent of the parties can be ascertained from the face of their agreement.'" *Postlewaite v. McGraw–Hill, Inc.*, 411 F.3d 63, 67 (2d Cir.2005) (quoting *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 197, 626 N.Y.S.2d 174 (N.Y.App.Div.1995)). Accordingly, "if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir.2005) (citation omitted). By contrast, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." *Id.* (citation omitted).

The terms of the Agreement are straightforward and unambiguous. The Agreement states that "AMEX agrees to pay TCG an additional fee ('gain sharing') based on the *calculated benefit* of the *net savings* to AMEX ... realized* during the calendar year 2001 *resulting from the materials, training, coaching and development of personnel* contemplated by this Agreement." (Amendment ¶ 9(c) (emphasis added).) The parties agreed that the gain sharing would be "determined by AMEX using the system it uses itself to internally track and report on such savings for internal business purposes.... The savings calculations from AMEX's system shall be determinative and not subject to challenge by TCG." (Agreement ¶ 8(c)(1).)

Furthermore, "[i]f *AMEX actual net savings shown on AMEX's tracking system described in Section 8.c.1 of this Agreement realized* during the calendar year 2001 equals or exceeds $106 million," AMEX agreed to pay TCG a gain sharing payment equal to $1 million, plus 10% of the amount by which the net savings exceed $106 million up to a maximum of $3 million. (Amendment, Ex. E (emphasis added).)

■ First, I must determine whether AMEX's procedure for calculating its savings accords with the terms of the Agreement. TCG argues that the express language of the Agreement does not contemplate that AMEX's Performance Group would determine the gain share payment through a "four-month deliberative process" or make deductions from the savings value generated by the System; rather, TCG contends AMEX was to rely solely on its System to determine the actual net savings realized. I disagree. To base the gain share payment on *all* of AMEX's savings—even savings that did not result from TCG's work—would simply erase Amendment ¶ 9(c), which ties the gain share to the savings "resulting" from TCG's "materials, training, coaching and development of personnel." *See DBT GmbH v. J.L. Min. Co.*, 544 F.Supp.2d 364, 377–78 (S.D.N.Y.2008) (quoting "the fundamental rule" of contract interpretation which "gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect") (citations omitted). In fact, in his deposition, TCG's Weiss agreed that "if American Express realized savings that were attributable to services that were not provided under [the parties'] agreement, that wouldn't go into the equation of calculating a net savings." Weiss further acknowledged that AMEX "has many activities going on across the organization, not all of which would fall

into this agreement." Therefore, the savings value generated by the System ($149,596,801), which incorporates savings that are unrelated to TCG's contractual duties, cannot be the sole basis establishing the gain sharing payment due to TCG.

■ Second, I must analyze whether AMEX's "deliberative process" correctly determined that TCG was not due a gain share payment. Arguing that TCG is owed a gain share payment, TCG relies on one of the Excel worksheets attached to Young's March 25, 2002 email, which shows a savings of $107,373,629 and a gain share payment of $1 million. Even though discovery has concluded and TCG has cross-examined members of AMEX's Performance Group, TCG is still unable to demonstrate that this worksheet reflects AMEX's final calculation of savings attributable to TCG. From all that appears, it is merely a draft calculation. TCG does not propose any trial witnesses who could authenticate or substantiate this vagrant document as AMEX's final determination. By contrast, Young's email relied exclusively on the other worksheet in the Excel file; Young wrote TCG that "the threshold amount achieved is $90,862,649" and that "no gain sharing payment is due." This has been AMEX's consistent position throughout the case. It remains unrebutted in the evidence before me.

In further support for TCG's position, Weiss avers that, in an August 2001 conference call, "it was reported that [AMEX] had achieved its $106 million savings goal." In his deposition, however, Weiss admitted that he "was not on" this conference call, "but was told about [it] afterward" by Zentner, who was on the call. However, Zentner testified that he did not have any discussions with Weiss "about the concept of net savings in connection with gain share" or about "which projects would and

which projects would not be counted towards the gain share." There is no admissible evidence that AMEX asserted in the telephone call that a $106 million savings goal was achieved.

Weiss also claims that, in the December 12, 2001 email, "Young indicated that the net savings as of November 2001 was $102mm," which "showed that the $106 million target would likely be met once the savings from December were included." Weiss's reliance is mistaken because Young specifically referred to the $102 million as the "Current *projected* Net Savings as of November, 2001," not the *actual* savings realized by AMEX attributable to TCG's work. (Emphasis added.) TCG cannot demonstrate that AMEX achieved over $106 million in savings such that TCG was owed a gain share payment.

Even after discovery and the opportunity to cross-examine AMEX's witnesses, TCG is unable to offer any evidence to contradict AMEX's gain share calculation. I must conclude there is no genuine issue of material fact, regarding the contention that AMEX did not owe TCG a gain sharing payment. Consequently, I will grant summary judgment on this aspect of the breach of contract claim.

## B. Breach of Contract's License and Confidentiality Provisions

TCG alleges that AMEX breached paragraphs 4 and 5 of the Agreement by: (1) distributing course materials "to contractors and consultants who had not signed and/or whose employers had not signed the confidentiality agreements required by the Contract" and "to persons not within its license;" (2) "fail[ing] to protect the confidential information in the course materials" by "allow[ing] its former employees to retain the course materials and disclose the course materials to third parties without limitation;" and (3) "induc[ing], encourag[ing] and permitt[ing] third parties

to distribute copies of the course materials without limitation." As a result of these alleged breaches, TCG seeks to "[p]reliminarily and permanently enjoin[ ] American Express from breach of paragraph 4 of the Contract," damages, and attorneys' fees pursuant to Section 9(g) of the Agreement.

■ "Under New York law, to establish a breach of contract a plaintiff must plead and prove four elements[:] (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Paxi, LLC v. Shiseido Americas Corp.*, 636 F.Supp.2d 275, 281–82 (S.D.N.Y.2009). While the parties concede that they entered a valid agreement, the remaining three elements are disputed.

### 1. AMEX's Breach

TCG argues that AMEX "completely ignored the Agreement in distributing Course Materials and providing training to non-employees." Section 5(b) of the Agreement grants AMEX a license to provide the Course Materials to "contractors and consultants who AMEX determines are integral to AMEX business initiatives" so long as these individuals and their employers each signed Confidentiality Agreements prior to receiving the Course Materials or participating in trainings. TCG argues that AMEX breached the license provision on multiple occasions. For example, the Confidentiality Agreements produced during discovery revealed that certain trained contractors signed Confidentiality Agreements, while their employers did not; furthermore, some agreements were not signed prior to training, as contractually required, but "long after the training had occurred." With respect to former AMEX employees, TCG claims that AMEX did not take proper steps to preserve TCG's confidential information in the Course Materials after the employees

left AMEX. TCG also contends that AMEX trained non-employees from Travel Impressions, Inc. without obtaining a signed Confidentiality Agreement from the company. Additionally, it is undisputed that AMEX trained and provided Course Materials to a contractor from IBM, even though she refused to sign a Confidentiality Agreement, and that AMEX did not retrieve those materials from her for two years.

With respect to confidentiality, the Agreement defines TCG's "confidential information" to "include its analysis and technique in course development." (Agreement ¶ 4.) In general, the Agreement requires the parties to protect the Confidential Information using reasonable care to prevent the unauthorized use, dissemination or publication of that information. (*Id.* at ¶ 4(b).) AMEX, as the recipient of TCG's confidential information, agreed not to "use the Confidential Information for its own benefit or profit without the express written permission of" TCG. (*Id.*) TCG claims that AMEX violated these provisions by contracting with Quality to incorporate TCG's Confidential Information into a computer-training program and on-line demo. Although AMEX purportedly asked Quality "to take down the demo and to cease the unauthorized use," TCG contends that Quality continued to use TCG's Confidential Information and, over a year later, TCG had to file a copyright infringement suit against Quality.

TCG has presented sufficient facts to survive summary judgment with respect to the breach element of its claim that AMEX breached the license and confidentiality provisions of the Agreement. As TCG points out, omitted from AMEX's argument "is any suggestion that [AMEX] did not breach the terms of the Agreement." While AMEX is unable to demonstrate as a matter of law that it did not breach the confidentiality provisions, as

my extensive survey of the factual record regarding this issue demonstrates, the individual breaches fairly attributable to AMEX appear technical, *de minimis* and lacking in any identifiable harm to TCG.

## 2. TCG's Performance

 AMEX argues that TCG breached the same confidentiality provisions it seeks to enforce against AMEX, and therefore TCG did not adequately perform under the Agreement. "A fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the nonbreaching party." *Bear, Stearns Funding, Inc. v. Interface Group–Nevada, Inc.*, 361 F.Supp.2d 283, 291 (S.D.N.Y.2005). AMEX claims that TCG violated the Agreement by sharing AMEX's confidential information with Zentner and his employer BGM even though neither signed a Confidentiality Agreement.

Section 4(f) of the Agreement states that "[k]ey employees of each party working on developing the Course Materials will be required to sign Confidentiality Agreements ... upon request as a condition to their working on the project." AMEX was aware that TCG hired BGM and Zentner as "consultants" to assist with the development of the Course Materials; in fact, they were retained in September 2001 before the creation of any materials. Although BGM and Zentner did not sign Confidentiality Agreements, nothing in the record suggests that they were TCG's "key employees" or, more importantly, that AMEX "request[ed] as a condition to their working on the project" that they sign Confidentiality Agreements. As a result, AMEX cannot demonstrate that TCG breached Section 4(f) of the Agreement.

In addition to compliance with the express terms of the Agreement, TCG also acted within the spirit of the confidentiali-

ty provisions. TCG entered a separate written contract with BGM and Zentner that included its own confidentiality provision, pursuant to which, Zentner testified, he had an obligation to maintain the confidentiality of AMEX's information. Consequently, AMEX has no basis for asserting that TCG breached the Agreement's confidentiality provisions such that TCG's performance was inadequate. Viewing the facts in the light most favorable to TCG, I conclude that TCG's own performance was adequate.

### 3. Damages

■ The parties dispute whether TCG suffered damage from AMEX's alleged breaches of the license and confidentiality provisions. AMEX argues that TCG's claim for breach of these provisions fails because the record lacks any evidence that TCG sustained damages as a result of the alleged breaches. TCG responds that AMEX's "distribution of the Course Materials and training to those outside the license prevented the recipients from obtaining legal copies and training from TCG," and therefore damages equal the $6 million value of the Course Materials and training classes.

To survive summary judgment, TCG must show there is a genuine issue of a material fact as to whether TCG "had been harmed by the breach of the confidentiality agreement." *Health Alliance Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 125–26 (S.D.N.Y.2007). TCG offers no proof that it suffered actual harm from AMEX's disclosures, aside from Quality's misappropriation of TCG's confidential information. However, that breach, even if attributable in some fashion to AMEX, was remedied by a Settlement and License Agreement, effective May 2005, in which Quality paid TCG a fee for a license to use TCG's confidential information. Beyond that incident, TCG offers no evidence of any harm it sustained from AMEX's al-

leged breaches of the confidentiality and license provisions. Moreover, TCG's $6 million valuation of damages suffered is little more than a reach for an available—albeit unsupported—number. TCG plucks the $6 million value from the parties' original agreement, but the amended and operative version values the "training, materials, and other services provided" at $4 million, i.e. the "Base Compensation." (Amendment, Ex. E.) Neither number can fairly do double duty as a viable damages figure.

At the summary judgment stage, I need to be satisfied that evidence of record would permit a reasonable jury to conclude that TCG has suffered *some* damage or injury to satisfy the final element of a breach of contract claim. *See Raymond Weil, S.A. v. Theron*, 585 F.Supp.2d 473, 486 (S.D.N.Y.2008) ("The question of material fact which must be submitted to a jury is whether the breach resulted in any damage to Plaintiff, as required by New York law ....."). TCG does not make a sufficient showing of damages evidence to create a genuine issue of material fact on this issue.

### 4. Injunction

TCG also seeks to enjoin AMEX from breaching Section 4 of the Agreement. Anticipating the current difficulty of proving damages, Section 9(g) of the Agreement recognizes that a "breach involving confidential information" in violation of Section 4 of the Agreement

> *will cause irreparable and continuing damage or injury to the other party, the exact amount of which would be difficult to ascertain* and for which there may be no adequate remedy at law, and that, for such reasons, among others, each respective party shall be entitled, as a matter of course, to request an injunction ... restraining any further

such violation as well as recovery from the other party of any and all costs and expenses sustained or incurred by the complaining party in obtaining such an injunction, including without limitation reasonable attorneys' fees.

(Agreement ¶ 9(g) (emphasis added).) In accordance with this contract provision, TCG seeks an injunction, attorneys' fees, and costs relating to AMEX's alleged breach of Section 4.

■ To obtain a preliminary injunction, TCG "must demonstrate: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir.2009) (internal citations and quotation marks omitted). TCG fails to meet this test.

■ First, TCG is unlikely to succeed on the merits because, as discussed above, TCG cannot identify any harm it has suffered from AMEX's alleged breaches of confidentiality. Second, TCG cannot demonstrate that it will suffer any harm in the absence of an injunction. TCG does not dispute that AMEX stopped using the TCG Course Materials by 2005. The record does not reveal to me another basis on which to enjoin AMEX from the use or dissemination of course materials it has already stopped using. An injunction, five years later, appears to be moot because there is no meaningful prospective relief that can be identified. Nevertheless, at the motion hearing on February 3, 2010, I ordered TCG to submit a proposed injunction order detailing the precise relief it seeks, which TCG failed to file by the due date of February 5, 2010. Indeed, it still has not filed a proposed form of order. Apparently even TCG is unable to identify meaningful injunctive relief. Without any guidance as to the actual activities TCG now seeks to enjoin, I decline to issue an injunction, and will grant summary judgment on this aspect of the breach of contract claim.

### C. Copyright License Accounting Claim

TCG seeks an accounting for copyright license to determine the amount of any benefit AMEX received from using the AMEX Process Improvement Course Materials outside of its license. As discussed above, there is a factual dispute as to whether AMEX violated its license by impermissibly distributing course materials to non-employees and third-party vendors. TCG argues that AMEX "has benefited [sic] from any projects completed by these unlicensed participants" in the form of the completion of "a project which results in savings," and requests an accounting "to determine the amount of any such benefit."

TCG's copyright claim only seeks an accounting relating to the licensing of the AMEX Process Improvement Course Materials, and not the Course Materials generally. Section 2(c) of the Agreement states that "[o]nce the Custom Course Materials have been integrated into the Base Course Materials (or if no changes to the Base Course Materials are required in AMEX's determination), the resulting materials" are defined as "the AMEX Process Improvement Course Materials." (Agreement ¶ 2(c).) When asked whether the AMEX Process Improvement Course Materials were "actually generated, created," Weiss testified: "We put together our base materials, we used our base materials, what I would call the base materials. We never had any custom course materials added in that I can recall at all." TCG therefore treats the contract term "AMEX Process Improvement Course Materials"

to mean the Base Course Materials because the Custom Course Materials were never created. AMEX, for its part, argues that the AMEX Process Improvement Course Materials could not have been created if the Custom Course Materials were not produced and accordingly could not be integrated into the Base Course Materials.

■ The distinction between Base Course Materials and AMEX Process Improvement Course Materials is critical because the Agreement provided that TCG owned the former but the parties jointly owned the latter. (Agreement ¶ 5(a).) TCG specifically tailored its copyright claim to the jointly-owned AMEX Process Improvement Course Materials, as opposed to Base Course Materials or Course Material generally. "A claim for accounting is a remedy premised on a determination of co-ownership because the duty to account for profits 'presupposes a relationship as co-owners of the copyright.'" *Carell v. Shubert Org., Inc.*, 104 F.Supp.2d 236, 246 n. 6 (S.D.N.Y.2000) (quoting *Weber v. Geffen Records*, 63 F.Supp.2d 458, 464 (S.D.N.Y.1999)). Consequently, TCG "must first establish that it is a co-owner, and ... cannot avoid this by the stratagem of failing to ask for a declaration of ownership as a method of avoiding the federal [three-year] limitations period for an ownership claim governed by the federal Act." *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik*, 510 F.3d 77, 87 (1st Cir.2007). The First Circuit in *Cambridge Literary Properties* declined to decide "[t]he question of whether a claim for an accounting for profits realized from exploitation of a jointly-owned copyright—once that ownership is established [under federal law]—is subject to state-law limitations".

■ I find that AMEX Process Improvement Course Materials were, in fact, created by operation of the contractual terms because the Agreement expressly states "if no changes to the Base Course Materials" are made, then "the resulting materials" are the AMEX Process Improvement Course Materials. (Agreement ¶ 2(c).) Nevertheless, I conclude the copyright claim is time-barred. "Civil actions under the Copyright Act are subject to a three-year statute of limitations, 17 U.S.C. § 507(b), and accrue when a plaintiff knows or has reason to know of the injury upon which the claim is premised."[3] *Tomas v. Gillespie*, 385 F.Supp.2d 240, 243 (S.D.N.Y.2005). The statute of limitations is triggered when "the plaintiff knows of the facts furnishing [it] with a claim, not that those facts are sufficient to entitle [it] to relief." *Id.*

If TCG's copyright claim accrued earlier than January 29, 2005, three years before TCG filed the instant case, then this action is time-barred. As early as January 31, 2002, TCG knew of facts supporting a claim that AMEX arguably violated the terms of its license by independently distributing co-owned material. On that date, TCG's counsel sent a letter to

---

**3.** In its Opposition, TCG argues that "an accounting is not a claim under the Copyright Act" and urges me to apply the six-year statute of limitations applicable to accounting proceedings in New York. *See Tydings v. Greenfield, Stein & Senior, LLP*, 11 N.Y.3d 195, 868 N.Y.S.2d 563, 897 N.E.2d 1044, 1048 (2008). TCG, however, brought this claim by referencing Copyright and cannot, at this juncture, invoke the more favorable state law (which was not pleaded in its Complaint) to spare its case. Moreover, even if TCG had asserted a New York state law accounting claim, at least one New York federal court construing New York law has held "Section 301 of the Copyright Act expressly preempts state law claims that are equivalent to claims 'falling within the scope' of the Copyright Act, including a state law claim for an accounting." *Carell v. Shubert Org., Inc.*, 104 F.Supp.2d 236, 249 n. 9 (S.D.N.Y.2000) (citation omitted).

AMEX's counsel stating that TCG was "advised that AMEX contracted with a third-party vendor to incorporate the TCG confidential information into a computer-training program" and "that vendor used such confidential material in an on-line demo." TCG's copyright claim was filed at least three years after the limitations period for a co-ownership claim had run. As *Cambridge Literary Properties*, 510 F.3d at 88, it may not be revived, even as a state law accounting claim, by the "stratagem" of ignoring the predicate of ownership under the Federal Copyright Act. In any event, it is not clear what an accounting, even if not time-barred, would accomplish because TCG has not suggested any instances where AMEX arguably profited from exploiting the jointly owned copyright. I therefore will grant summary judgment on this count as well.

### IV. CONCLUSION

For the reasons set forth more fully above, I GRANT the Defendant's motion (Doc. No. 23) for summary judgment on all counts of the Plaintiff's Complaint.